IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

ANTHONY J. CURRY,                          )
                                           )
            Plaintiff,                     )
                                           )
v.                                         )           CIVIL ACTION NO. 5:09-00859
                                           )
MICHAEL J. ASTRUE,                         )
Commissioner of Social Security,           )
                                           )
            Defendant.                     )

PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.

By Standing Order entered July 29, 2009 (Document No. 4.), this case was referred to the

undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit

Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. §

636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the

Pleadings (Document Nos. 11 and 14.), and Plaintiff's Reply. (Document No. 15.)

The Plaintiff, Anthony J. Curry, (hereinafter referred to as "Claimant"), filed applications for

DIB and SSI on February 1, 1999, (protective filing date), alleging disability as of January 22, 1999,

due to injuries sustained in a motor vehicle accident, including a broken jaw, broken right arm,

lacerated liver, and kidney problems. (Tr. at 81, 96.) The claims were denied initially and upon

reconsideration. (Tr. at 57-58, 60-62, 68-70, 251, 252-54, 256, 257-59, 260, 261-63, 264.) On August

17, 1999, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 71.)

Hearings were held on February 5, 2002, before the Honorable John L. Melanson (Tr. at 391-434.)

and on December 19, 2002, before the Honorable Richard J. Maddigan. (Tr. at 435-64.) By decision dated January 23, 2003, ALJ Maddigan determined that Claimant was not entitled to benefits. (Tr. at 27-35.) The ALJ's decision became the final decision of the Commissioner on June 27, 2003, when the Appeals Council denied Claimant's request for review. (Tr. at 21-22.)

On May 7, 2004, Claimant filed an appeal of the administrative decision pursuant to 42 U.S.C. § 405(g). Curry v. Astrue, Civil Action No. 2:04-00439 (S.D. W.Va. July 14, 2005). On June 10, 2005, United States Magistrate Judge Mary E. Stanley issued Proposed Findings and Recommendation recommending that the District Court find that Claimant was entitled to benefits for the one-year period from January 1999, through January 2000. Curry v. Astrue, Civil Action No. 2:04-00439 (S.D. W.Va. July 14, 2005) (Document No. 21.) Magistrate Judge Stanley further recommended that the case be remanded for consideration of whether Claimant was entitled to any benefits beyond that time. (Id.) She noted that the ALJ failed to reconcile discrepancies among Dr. Egnor's findings, Dr. Gajendragadkar's findings, and the state agency medical source's September 2000 findings. (Id.) In the absence of objections by either Claimant or the Commissioner, District Judge David A. Faber adopted Magistrate Judge Stanley's Proposed Findings and Recommendation, reversed the final decision of the Commissioner consistent with Magistrate Judge Stanley's Proposed Findings and Recommendation, and remanded the case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). Curry v. Astrue, Civil Action No. 2:04-00439 (S.D. W.Va. July 14, 2005) (Document No. 22.).

By Order entered November 30, 2005, the Appeals Council, based on the District Court's Order, vacated ALJ Maddigan's decision and remanded the case to an ALJ for further proceedings consistent with the District Court's Order. (Tr. at 512, 566.) The Appeals Council directed the ALJ to offer Claimant the opportunity for a hearing, take any further action needed to complete the administrative record, and to issue a new decision. (Tr. at 512, 566.) Additional hearings were held

2

on October 25, 2006, and April 11, 2007 before the Honorable Theodore Burock. (Tr. at 862-914, 915-40.) By decision dated May 20, 2008, ALJ Burock determined that Claimant was not entitled to benefits. (Tr. at 480-99.) The ALJ's decision became the final decision of the Commissioner on May 28, 2009, when the Appeals Council denied Claimant's request for review. (Tr. at 474-77.) Claimant filed the present action seeking judicial review of the administrative decision on July 29, 2009, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2008). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether

3

the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2008). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, January 22, 1999. (Tr. at 483, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from borderline intellectual functioning and impairments of the right upper extremity and back, which were severe impairments. (Tr. at 483, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 492, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform at least sedentary level work with the following limitations:

> The [C]laimant is limited to work involving routine repetitive tasks. He can occasionally balance but never climb ladders, ropes, or scaffolds. He cannot tolerate concentrated exposure to vibration or any exposure to hazards.

(Tr. at 493, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 497, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a stationary guard, cashier, and toll collector, at the light level of exertion. (Tr. at 497-98, Finding No. 9.) On this basis, benefits were denied. (Tr. at 499, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was

4

defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on March 5, 1973, and was 34 years old at the time of the last administrative hearing, April 11, 2007. (Tr. at 81, 497, 868.) Claimant has an eighth grade education, a General Equivalency Diploma, and is able to communicate in English. (Tr. at 497, 870.) In the past, he worked as an inserter, inserting advertisements in newspapers for delivery. (Tr. at 97, 497.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ acted as his own medical expert and refused to follow the remand order of this District Court. (Document No. 11 at 11-18.) First, Claimant asserts that the ALJ failed to abide by

this District Court's Order finding that Dr. Chillag's opinion was "well-supported by medical evidence" and that Claimant was entitled to a one-year closed period of benefits from January 1999 through January 2000. (Id. at 11-12.) Rather, Claimant notes that the ALJ determined that Dr. Chillag's opinion was not supported by medical evidence or explanation. (Id.)

Second, Claimant asserts that the ALJ acted as his own mental health expert when he rejected the diagnoses of all the psychologists of record and when assessing his RFC. (Document No. 11 at 12-14.) Claimant points out that the ALJ's "treatment of the mental health records also displays the length to which the ALJ became his own medical expert." (Document No. 11 at 12.) Finally, Claimant alleges that the ALJ also acted as his own medical expert when he assessed his physical RFC. (Document No. 11 at 15-16.)

The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 14 at 12-25.)

Analysis.

1. Failure to Follow Remand Order.

Claimant first alleges that the ALJ erred when he refused to follow this District Court's Order of remand. (Document No. 11 at 11-12.) He points out that Magistrate Judge Stanley found that Dr. Chillag's opinion that Claimant was entitled to at least a one-year period of disability from January 1999 through January 2000, was well-supported by medical evidence. (Id. at 11.) He further points out that Judge Stanley therefore recommended that the District Court find that Claimant was entitled to benefits for that one year period of time. (Id.) The District Court adopted Judge Stanley's findings and recommendations, but ALJ Burock, Claimant asserts, nevertheless determined that Dr. Chillag's opinion was not well supported by medical evidence or explanation and failed to award benefits for any time period. (Id.) Claimant asserts that ALJ Burock "deliberately refuse[d] to honor a decision by a Federal District Court." (Id. at 12.)

Citing the Hearings, Appeals and Litigation Law Manual, I-2-8-18, *Administrative Law Judge Decisions in Court Remand Cases*, the Commissioner asserts that once the Appeals Council vacated the Commissioner's prior final decision, the ALJ was required to consider all pertinent issues *de novo*. (Document No. 14 at 13.) The Commissioner further states that the ALJ properly determined that Dr. Chillag's medical opinion was not supported by the medical evidence or explanation. (Id.)

Pursuant to the Hallex Manual, I-2-8-18, as cited by the Commissioner, when the Appeals Council receives a case on remand from a District Court, the Appeals Council generally will vacate the Commissioner's decision that was remanded, and therefore, the ALJ will be required to consider all pertinent issues *de novo*. Nevertheless, as Claimant points out, if the District Court found that the claimant was disabled, then the ALJ is required to develop the record as necessary, and follow the order of the Court. Id. In Curry v. Astrue, Civil Action No. 2:04-00439 (S.D. W.Va. July 14, 2005), Magistrate Judge Stanley stated in her Proposed Findings and Recommendation with regard to Dr. Chillag's opinion, as follows:

> After considering all of the evidence, however, the court finds that Dr. Chillag's opinion is well-supported by medical evidence. Claimant was recovering from liver lacerations and severe arm fractures. He also had jaw fractures which Dr. Chillag noted would have made eating difficult. (Tr. at 430.)
> * * *
> The undersigned further proposes that the presiding District Judge find that Claimant is, at minimum, entitled to benefits for the one-year period from January 1999 through January 2000; and remand this case for consideration of whether Claimant is entitled to any benefits beyond that time.

Curry v. Astrue, Civil Action No. 2:04-00439 (S.D. W.Va. July 14, 2005) (Document No. 21 at 15-16.) Neither Claimant nor the Commissioner filed any objections to Magistrate Judge Stanley's Proposed Findings and Recommendations, and therefore, District Judge Faber adopted her findings and recommendations, reversed the final decision of the Commissioner, and remanded the case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). Curry v. Astrue, Civil

Action No. 2:04-00439 (S.D. W.Va. July 14, 2005) (Document No. 22.). The undersigned finds that in adopting Magistrate Judge Stanley's findings and recommendation, District Judge Faber effectively remanded the case for an award of benefits for a closed period, from January 1999 through January 2000. Consequently, under the principles of res judicata and pursuant to the Hallex Manual, ALJ Burock was not entitled to re-weigh Dr. Chillag's opinion and deny benefits for the same period of time. Accordingly, the undersigned recommends that the presiding District Judge reverse ALJ Burock's decision and remand this case for an award of benefits from January 1999 through January 2000.

2. <u>ALJ Acting as Medical Expert</u>.

Claimant next alleges that the ALJ's decision is not supported by substantial evidence because he acted as his own medical expert in assessing Claimant's mental and physical impairments. (Document No. 11 at 12-18.) Regarding Claimant's mental impairments, he asserts that the ALJ rejected the diagnoses by all reviewing and evaluating psychologists of a personality impairment with antisocial traits, and substituted his own opinion as to why Claimant did not suffer from such impairment. (<u>Id.</u> at 13-15.) He notes that the ALJ placed too much emphasis on inconsistencies between Claimant's efforts and psychological test results, and asserts that such behavior is consistent with an anti-social personality disorder. (<u>Id.</u> at 17.) Claimant further asserts that the ALJ improperly rejected the opinions of Psychologists Kelly and Sowell regarding the limitations resulting from Claimant's mental impairments. (<u>Id.</u> at 15-18.) Regarding his physical impairments, Claimant asserts that the ALJ also played the role of medical expert in assessing Claimant's RFC. (<u>Id.</u> at 15-16.) Specifically, Claimant asserts that the ALJ did not identify the medical facts on which he relied in restricting Claimant to routine repetitive tasks. (<u>Id.</u> at 15.)

In response, the Commissioner asserts that the ALJ properly found that Claimant did not suffer from a severe personality disorder because he was neither diagnosed as suffering from the

disorder, nor met the diagnostic criteria. (Document No. 14 at 19.) Rather, the Commissioner points out that the various evaluators assessed only anti-social personality traits and personality disorder not otherwise specified ("NOS"). (Id.) The Commissioner therefore asserts that the ALJ was entitled to rely on what the evidence of record did not say: namely that the absence of a specific diagnosis by the medical experts meant that Claimant did not suffer from a personality disorder. (Id. at 20.) Furthermore, the Commissioner identifies inconsistencies between Claimant's argument and the record, particularly regarding his alleged extensive history of altercations, problems with the law, and other deviant behavior. (Id.) The Commissioner points out that at the 2006 administrative hearing, Claimant asserted that he had been arrested only twice. (Id.) Consequently, the ALJ concluded that his credibility was compromised and could not be relied upon wholly to award Claimant benefits. (Id.)

The Commissioner further asserts that the ALJ properly found that Claimant's intellectual functioning was in the borderline, not mildly mentally retarded range. (Id. at 18.) He notes that psychological testing indicated that Claimant exaggerated his symptoms and may have portrayed himself in an especially negative or pathological manner. (Id.) Nevertheless, the Commissioner asserts that the ALJ found that Claimant's borderline intellect resulted in moderate limitations in maintaining concentration, persistence, or pace, and therefore, limited him to performing routine, repetitive tasks. (Id. at 19.) The Commissioner also asserts that Claimant received no psychiatric or mental health treatment and that he had no episodes of decompensation. (Id. at 21.)

In reply, Claimant asserts that though he may not meet all of the criteria for antisocial personality disorder, he would exhibit many of the symptoms and that any kind of personality disorder would have a serious negative impact on the individual's ability to work. (Document No. 15 at 4.) Claimant further asserts that given the conflicting mental diagnoses in the record, the testimony from a mental health expert was required. (Id.) Claimant further asserts that because a

9

personality disorder must be diagnosed based on the individual's long term pattern of functioning, a medical expert was required. (Id. at 5.) Claimant also acknowledged that it is the ALJ's duty to assess the RFC, but asserts that his assessment must be supported by medical evidence and functional limitations. (Id. at 4.)

Mental Impairments.

The medical evidence establishes that Claimant received no mental health treatment at any time relevant to his claims. He did, however, undergo five psychological evaluations by three different evaluators. On July 20, 1999, Psychologist Sheila E. Kelly, MA, conducted a psychological evaluation of Claimant and administered the WAIS-III and WRAT-III, at the request of Claimant's attorney. (Tr. at 228-38.) Claimant denied any history of psychiatric treatment or suicide attempts. (Tr. at 230, 232.) On mental status examination, Ms. Kelly observed a dull affect and intellect and soft and slightly slurred speech, which was coherent and spontaneous. (Tr. at 231-32.) She noted that Claimant's concentration and memory were appropriate for his intellect and that his problem solving skills were poor. (Tr. at 232.) He was oriented in all spheres. (Id.) On the WAIS-III, Claimant earned verbal, performance, and full scale IQ scores of 69, 63, and 64, respectively, which scores fell within the mild range of mental retardation. (Tr. at 232-33.) On the WRAT-III, Claimant read at the fifth grade level and did arithmetic at the fourth grade level. (Tr. at 233.) Ms. Kelly diagnosed mild mental retardation, very limited literacy, history of alcohol abuse and probable dependence in remission by self-report, and anti-social personality traits. (Tr. at 234.)

Claimant reported spending most of his day socializing with unemployed friends, watching television, playing video games, and sitting on the porch. (Tr. at 231, 233.) He indicated that he mostly stayed at home and babysat his girlfriend's hyperactive child. (Tr. at 231) Claimant reported that his girlfriend did all the housework and paid the bills. (Id.) Ms. Kelly noted that Claimant was not significantly limited in terms of social functioning and that he got along reasonably well with his

friends. (Tr. at 233-34.)  She further noted, however, that he had a history of aggressive, randomly violent behavior. (Tr. at 234.) Ms. Kelly opined that Claimant "would not take well to any extensive sort of supervision," but was able to perform simple tasks. (Id.) She further opined that Claimant was functioning in the mild range of mental retardation and that his literacy was limited extremely. (Id.)

Dr. Timothy J. Freeman, Ph.D., a clinical psychologist, prepared a form Psychiatric Review Technique, on which he opined that Claimant's organic mental disorders stemming from his closed head injury were too early for evaluation that would reveal sequella. (Tr. at 203-18.) On July 29, 1999, Dr. Robert W. Solomon Ed.D., affirmed Dr. Freeman's form as written. (Tr. at 203.)

On November 8, 2000, Joann B. Daley, MA, conducted another psychological evaluation of Claimant at the request of the state agency. (Tr. at 354-59.) Claimant denied any history of mental treatment, but reported suicidal ideation without plan when he broke up with his girlfriend and when his father passed away. (Tr. at 355.) Claimant reported having had a bad temper, that he argued and pushed his girlfriend, poor sleep, and a varying, but not depressed mood. (Tr. at 354-55.) Mental status exam revealed good eye contact, complete but minimal spontaneous conversation, relevant and coherent speech, a euthymic mood and broad affect, normal insight and average judgment, normal immediate and recent memory but vague remote memory, and moderately deficient concentration. (Tr. at 357.) Ms. Daley noted that Claimant had no evidence of thought process impairment, delusions, paranoia, preoccupations, obsessions, or phobias, or any perceptual impairments. (Id.) On the WAIS-III, Claimant earned verbal, performance, and full scale IQ scores of 83, 81, and 80, respectively. (Id.) On the WRAT-III, Claimant read at the high school level, performed arithmetic at the seventh grade level, and spelled at the fifth grade level. (Tr. at 358.) Ms. Daley diagnosed alcohol abuse in remission by self-report, borderline intellectual functioning, and personality disorder NOS with anti-social and borderline traits. (Id.) Claimant reported his activities to have included visiting friends and family, eating out, cooking simple meals, and watching television. (Tr. at 359.)

Ms. Daley opined that Claimant's social functioning was within normal limits as he reported having at least ten friends, playing cards, and occasionally eating out. (Id.)

On November 29, 2000, Dr. Solomon prepared a form Psychiatric Review Technique on which he opined that Claimant's personality disorder and substance addiction disorders in remission were non-severe impairments. (Tr. at 340-53.) He further opined that these mental impairments resulted in no restrictions of activities of daily living and failed to result in repeated episodes of decompensation. (Tr. at 350.) Nevertheless, he assessed mild limitations in maintaining social functioning, concentration, persistence, or pace. (Id.)

Ms. Kelly re-evaluated Claimant, at his attorney's request, on September 14, 2001. (Tr. at 370-75.) Claimant reported that he spent most of the morning sleeping, watched television, talked to his relatives, and played simple card games. (Tr. at 371-72.) On mental status exam, Claimant did not appear to suffer from any depression or anxiety, complained of digestive problems and noted that he had lost 15 pounds in one week. (Tr. at 372.) Ms. Kelly noted that Claimant's mood was within normal limits, that his concentration and memory were appropriate for intellectual functioning, and that he denied any suicidal ideation or history of attempts. (Id.) On the WRAT-III, Claimant earned verbal, performance, and full scale IQ scores of 73, 67, and 67, respectively, which scores fell within the mild range of mental retardation. (Tr. at 373.) On the WRAT-III, Claimant read at the sixth grade level and performed arithmetic at the fourth grade level, which reflected limited literacy and poor arithmetic skills. (Id.) Ms. Kelly opined that Claimant's social functioning was reasonably competent given his intellectual functioning and that his judgment was fairly poor by history. (Tr. at 374.) She diagnosed mild mental retardation, fairly limited literacy, history of polysubstance abuse and dependence in remission by self-report, and anti-social personality traits. (Tr. at 374-75.)

On September 14, 2001, Ms. Kelly also completed a form Mental Residual Functional Capacity Evaluation, which indicated that Claimant was extremely limited in the ability to

understand, remember, and carry out detailed instructions. (Tr. at 385.) Ms. Kelly opined that Claimant was markedly limited in his ability to maintain attention for extended periods, maintain regular attendance and be punctual within customary tolerances, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (Tr. at 385-86.) She also assessed moderate limitations in his ability to remember work-like procedures, sustain ordinary routine without special supervision, make simple work-related decisions, complete a normal work day and work week without interruptions, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in a routine work setting, and understand, remember, and carry out simple instructions. (Id.) Finally, Ms. Kelly assessed only slight limitations in Claimant's ability to work in coordination or proximity to others without being unduly distracted by them, ask simple questions or request assistance, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness or cleanliness, and be aware of normal hazards and take appropriate precautions. (Id.) Ms. Kelly noted that Claimant's impairments had or could have been expected to last twelve months, but that his psychiatric condition reasonably would not be expected to exacerbate any pain or physical condition. (Tr. at 387.)

Ms. Daley performed a follow-up psychological evaluation of Claimant on May 2, 2003, at the request of the state agency. (Tr. at 817-20.) Claimant reported a long history of alcohol abuse and a then current drinking habit mostly on the weekends with blackouts "lots of times." (Tr. at 818.) On mental status exam, Claimant's mood was solemn and he appeared tired, his affect was constricted, and his stream of thought was within normal limits. (Tr. at 819.) Insight and memory were within normal limits and his judgment was average. (Id.) Ms. Daley noted that Claimant's concentration was moderately deficient but that his persistence, pace, and social functioning were within normal limits.

13

(Id.) Ms. Daley diagnosed alcohol abuse, borderline intellectual functioning by history, and personality disorder NOS with anti-social and borderline traits. (Id.)

At the request of Claimant's attorney, Sally Sowell, M.A., a licensed psychologist, conducted yet another psychological evaluation of Claimant on February 27, 2004. (Tr. at 786-90.) Claiamnt was cooperative and rapport was obtained easily. (Tr. at 787.) Claimant exhibited normal eye contact, was oriented in all spheres, and exhibited normal psychomotor behavior, thought process, thought content, and perceptual process. (Id.) His immediate memory was within normal limits, his recent memory was moderately impaired, and his remote memory was mildly deficient. (Id.) Ms. Sowell noted that Claimant's attention and concentration and insight and judgment were mildly impaired, but that his persistence, effort, and pace were within normal limits. (Tr. at 788.) Claimant's affect was broad and appropriate to content and his mood was euthymic. (Id.) Claimant denied current homicidal or suicidal ideation. (Id.) On the WRAT-III, Claimant earned verbal, performance, and full scale IQ scores of 78, 75, and 75, respectively. (Id.) On the WRAT-III, Claimant read at the seventh grade level, performed arithmetic at the sixth grade level, and spelled at the fifth grade level, which scores indicated a borderline to low average level of performance. (Tr. at 789.) Ms. Sowell diagnosed panic disorder without agoraphobia, intermittent explosive disorder, and borderline intellectual functioning. (Tr. at 790.)

Ms. Sowell also completed a form mental Residual Functional Capacity Assessment on which she opined that Claimant was markedly limited in his ability to understand and remember detailed instructions, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (Tr. at 791-92.) Ms. Sowell indicated that the remaining specified functions were either only slightly or moderately limited. (Id.)

On May 15, 2003, Debra L. Lilly, Ph.D., completed a form Psychiatric Review Technique,

on which she opined that Claimant's personality and substance abuse disorders were non-severe impairments, resulting in only mild limitations in activities of daily living and maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. at 843-56.) Dr. Rosemary L. Smith, Ph.D., affirmed Dr. Lilly's opinion as written, on September 26, 2003. (Tr. at 843.)

In his decision, the ALJ concluded that Claimant's intellectual functioning was borderline, and noted that psychological testing revealed that Claimant "may have tried to present himself...as more limited than he actually is." (Tr. at 488.) The ALJ further found that the medical evidence did not establish a personality disorder because Claimant did not exhibit any significant distress or impairment pursuant to the diagnostic criteria. (Tr. at 489-90.) In support of this decision, the ALJ stated:

> Ms. Daley concluded that there was an 'enduring pattern of deviant behavior, with a history of fighting, alcohol abuse, failure to work consistently, and being in jail.' But the claimant has not exhibited any significant distress or impairment. He maintains relations with relatives in the neighborhood. He has friends. He described two successive long term relationships, the most recent resulting in marriage. The claimant admits that he does little to help around the house, but this may reflect a cultural bias. Prior to the claimant's accident in January 1999, he held a part-time job for over two years and earned a steady, albeit meager income. Ms. Kelly apparently based her diagnosis on the claimant's history as an adolescent and some unspecified 'altercations' in the neighborhood. The claimant's wife told Judge Melanson in February 2002 that the claimant had not had any significant trouble with the law in recent years. And the claimant's problems with the law since then appear to have the result of domestic problems. The claimant testified in October 2006 that he was getting a divorce but in May 2007 that he was reconciling.

(Tr. at 490.)

According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), the essential feature of a personality disorder is defined as "an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture and is manifested in at least two of the following areas: cognition, affectivity, interpersonal functioning, or impulse

15

control." Id. at 630. The enduring pattern is characterized as being inflexible and pervasive over a "broad range of personal and social situations...and leads to clinically significant distress or impairment in social, occupational, or other important areas of functioning." Id. Typically the pattern begins at adolescence or early adulthood, and therefore, is stable and of long duration. Id. The DSM-IV defines the general diagnostic criteria for personality disorder as follows:

A.   An enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture. This pattern is manifested in two (or more) of the following areas:
(1)  cognition (i.e., ways of perceiving and interpreting self, other people, and events)
(2)  affectivity (i.e., the range, intensity, lability, and appropriateness of emotional response)
(3)  interpersonal functioning
(4)  impulse control

B.   The enduring pattern is inflexible and pervasive across a broad range of personal and social situations.

C.   The enduring pattern leads to clinically significant distress or impairment in social, occupational, or other important areas of functioning.

D.   The pattern is stable and of long duration and its onset can be traced back at least to adolescence or early adulthood.

E.   The enduring pattern is not better accounted for as a manifestation or consequence of another mental disorder.

F.   The enduring pattern is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition (e.g., head trauma).

DSM-IV at 633.

The ALJ acknowledged Ms. Daley's diagnosis of a personality disorder NOS with antisocial and borderline traits, as well as Ms. Kelly's diagnosis of antisocial personality traits. (Tr. at 489-90.) Nevertheless, the ALJ concluded that criteria "C," was lacking or that Claimant's enduring pattern failed to lead to clinically significant distress or impairment of functioning.  (Tr. at 490.) The DSM-

16

IV provides that "[o]nly when personality traits are inflexible and maladaptive and cause significant functional impairment or subjective distress do they constitute Personality Disorders." Id. at 630 The ALJ noted that Claimant maintained relations with friends and relatives; reported two long-term relationships with a woman, the last of which resulted in marriage; and maintained a part-time job for a two-year period of time. (Id.) He also noted that Claimant engaged in unspecified altercations as an adolescent, was involved in domestic problems, and was getting a divorce. (Id.) Furthermore, he noted that Claimant did little to assist with the housework, but found that may be the result of a cultural bias. (Id.) Thus, the ALJ concluded that Claimant's antisocial personality and borderline traits did not result in significant distress or impairment of functioning. (Id.)

The undersigned finds however, that the ALJ's finding is contrary to the substantial evidence of record. Not only did Ms. Daley specifically diagnose a personality disorder with antisocial and borderline traits, but Ms. Kelly, too, assessed antisocial personality traits; Dr. Solomon, a reviewing state agency consultant noted a personality disorder; and Drs. Lilly and Smith noted that Claimant had "inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress," but which did "not precisely satisfy the diagnostic criteria." Consequently, the record suggests that Claimant suffers from some type of a personality disorder, which may not meet the specific criteria of an antisocial personality disorder. The undersigned notes that the record reflects several instances of legal difficulties for Claimant, beginning when he was an adolescent. The record, however, is not clear as to the extent of his legal difficulties or how long they lasted. For instance, the record reflects several incidents of domestic problems, incarceration at the age of eighteen for breaking and entering, and his reports that he subsequently was "in jail every other week...for breaking in stuff." (Tr. at 818.) In 1991, he served six months of incarceration at the Anthony Correctional Center. (Tr. at 787.) In 2000 Claimant was

17

incarcerated ten days for malicious wounding. (Id.) Claimant also has a lengthy history of alcohol abuse. (Id.) The undersigned finds that given the evidence of record, a medical expert was necessary for the ALJ to assess Claimant's RFC resulting from his mental impairments. Accordingly, the undersigned recommends that this matter be remanded for further consideration of Claimant's personality disorder, including any limitations the disorder may have on his functioning.

Physical Impairments.

Claimant also alleges that the ALJ erred in assessing Claimant's physical RFC. (Document No. 11 at 15-16.) He asserts that ALJ Burock rejected the findings of Drs. Gajendragadkar and Bhurid and relied on the limitations found by Dr. Rothkopf, the testifying medical expert. (Id. at 15.) To this end however, Claimant asserts that the ALJ failed to discuss or analyze Dr. Rothkopf's testimony or explain how his testimony supported the assessed limitations. (Id. at 16.) Citing SSR 96-8p, Claimant asserts that the ALJ was required to include a narrative discussion explaining how the evidence supported each conclusion of his RFC assessment by citing specific medical facts and non-medical evidence. (Id.) Claimant further alleges error in the ALJ's reliance on Dr. Rothkopf's testimony because *inter alia*, numerous and critical portions of his testimony are inaudible. (Id. at 19.)

In response, the Commissioner alleges that the inaudible portions of the transcript of Dr. Rothkopf's testimony relate to his review of the medical records, which is included in the record. (Document No. 14 at 12.) Consequently, the Commissioner asserts that the inaudible portions of the transcript did not impair the Court's review of the ALJ's decision. (Id.) The Commissioner further asserts that Claimant does not explain why the inaudible portions of the transcript would prevent judicial review. (Id.)

Claimant asserts in reply, that the inaudible portions of Dr. Rothkopf's testimony related in

part to his opinion that additional x-rays or MRIs were needed, but the inaudibility of his testimony makes it difficult to determine how important the additional evidence may be. (Document No. 15 at 2.)

"Whether the transcript is inadequate depends upon the materiality of the omissions. The plaintiff shoulders the burden of showing that some material evidence was not reported or was so incompletely reported that its effect is obscured." McGlone v. Heckler, 791 F.2d 1119, 1120 (4th Cir. 1986) (per curiam). In McGlone, the Court found that there was no attempt to make any such showing. See id. The Court noted that although the plaintiff was not represented by counsel in the hearing before the administrative law judge, his lawyer in the district court could have ascertained from him what, if any, relevant evidence was offered at the hearing but not reported. See id. As there was no identification of any such omitted evidence, and the transcript actually disclosed evidence supporting the Commissioner's decision, the transcript was deemed adequate and the denial of benefits affirmed. See id.

The transcript of Dr. Rothkopf's testimony reveals that the majority of his discussion of the evidence, including the necessity of additional radiological imaging, is inaudible. Though his opinion is audible, his discussion of the evidence, which formed his opinion, is inaudible. The Commissioner correctly points out that the medical evidence is of record and available for the Court's review. However, it is the medical expert's interpretation and analysis of the evidence that was important to the ALJ's acceptance of his opinion, and therefore, the Court's review of the ALJ's decision. The undersigned notes that the inaudible portions of the testimony generally span a period of ten seconds, but occur frequently making it difficult to understand Dr. Rothkopf's review of the evidence. Because the ALJ relied on his opinion in weighing the medical evidence and in assessing Claimant's physical RFC, the undersigned finds that the transcript of his testimony is inadequate and that this matter must

be remanded. The undersigned is unable to review fully the ALJ's physical RFC assessment, and therefore, defers examining the assessment in its totality.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 14.), **REMAND** this matter for an award of benefits from January 1999 through January 2000, **REVERSE** the final decision of the Commissioner consistent with the proposed findings herein, **REMAND** this matter for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986);

Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Judge Berger, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 13, 2010.

R. Clarke VanDervort
United States Magistrate Judge